UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                  Case No. 21-20207

DAVID DEQUANTAE-RAYSHEON
MICKENS,

    Defendant.
_____/

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**

Defendant David Dequantae-Raysheon Mickens is charged with being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1). (ECF No. 13, PageID.23.) Defendant's charge stems from his presence at a controlled purchase of heroin conducted by agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). (ECF No. 28, PageID.85-86; ECF No. 29, PageID.106-07.) Agents from ATF contacted the Detroit Police Department ("DPD") and relayed information regarding the transaction, ultimately leading to the seizure of a firearm and subsequent arrest of Defendant. (*Id.*)

Before the court is Defendant's motion to suppress; he asserts DPD officers violated the Fourth Amendment and that the "correct remedy in this case is to suppress the 9mm Taurus recovered by [DPD]" at trial. (ECF No. 28, PageID.102.) The government filed a response, arguing first that Defendant lacks standing to contest a search conducted by law enforcement, but nonetheless, any effectuated search or seizure was lawful. (ECF No. 29.) Defendant did not submit a reply. The court held an

evidentiary hearing on October 20, 2021. For the reasons stated at the hearing and more fully set forth below, Defendant's motion will be denied.

## I. BACKGROUND

On November 10, 2020, agents from ATF organized a controlled purchase of heroin with the assistance of a confidential informant. (ECF No. 29, PageID.106.) The informant advised that Defendant was not only present at the scene but was "armed and bragged about being previously incarcerated." (*Id.*) The informant also had a discussion with one of the sellers and Defendant "concerning a future purchase of firearms" and upcoming plans to transport cocaine. (ECF No. 29, PageID.106.)

Soon after, ATF agents reported this information to DPD, explaining that ATF had just "observed a hand to hand transaction consistent with narcotics sales in the area." (ECF No. 28, PageID.85.) DPD was notified that an "involved party in the narcotics transaction was armed with a firearm" and that this person was seen entering the passenger seat of a blue "2009 Lincoln MKZ that had an unregistered license plate not belonging to it." (ECF No. 28, PageID.85-86, 96; ECF No. 29, PageID.106-07.) Officers Dykema and Brotzke of DPD were informed of the license plate number and learned that the license plate was expired and did not have insurance. (ECF No. 28, PageID.86-87; ECF No. 29, PageID.107.) According to Defendant, he was with the driver of the Lincoln—his cousin—because Defendant had given him $10 to drive to a family member's house. (*See* ECF No. 28, PageID.85.)

A short time later, relying on the information received from ATF, Officers Dykema and Brotzke approached the Lincoln after observing it pull into a gas station and park; it carried the same license plate reported by ATF. (ECF No. 28, PageID.86; ECF No. 29,

PageID.107.) Defendant was seated in the passenger seat. (ECF No. 33, Ex. A at 0:29-32.) Having learned from ATF that Defendant was armed, Officer Brotzke immediately ordered Defendant to put his hands up as he approached with his gun drawn. (*Id.*, Ex. A at 0:30-0:36.) This order was repeated multiple times, but Defendant would not comply. (ECF No. 29, PageID.107-08; ECF No. 33, Ex. A at 0:35-2:30.) Instead, he intermittently dropped his hands toward his lap or under his seat and began reaching around the interior of the car to lock the doors. (*Id.*, Ex. A at 0:37-0:43, 1:02-1:05, 1:12-1:16, 1:38-1:43, 1:44-1:46.) As officers attempted to gain access to his car, Defendant dipped his shoulder toward the floor of the vehicle and turned squarely at Officer Brotzke, who quickly backed away to take cover in anticipation of Defendant drawing a gun. (*Id.*, Ex. A at 2:12-21.) Eventually, the officers were able to unlock the vehicle and detain Defendant. (*Id.*, Ex. A at 2:28-2:45.) As they secured him, the officers at the scene spotted a firearm with a large, extended magazine protruding out from under Defendant's seat onto the passenger floorboard area; after seizing it, Officer Brotzke discovered the weapon was loaded with nine live rounds. (*Id.*, Ex. A at 2:40-3:20, 4:04-4:24; ECF No. 29, PageID.108.)

      Defendant is charged with being a felon in possession of a firearm and seeks to suppress evidence of the recovered handgun at his trial. (ECF No. 28.) The government argues that as a passenger in the vehicle, he does not have standing to object to a search because he lacked both an expectation of privacy and possessory interest in the car at the time of the search. (ECF No. 29, PageID.108-09.) It further argues that to the extent he has standing to contest law enforcement's seizure of his person, the officers complied with the requirements of the Fourth Amendment. (*Id.*, PageID.109-18.)

## II. STANDARD

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The purpose of the Fourth Amendment is "to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Taylor v. City of Saginaw*, 922 F.3d 328, 332 (6th Cir. 2019) (quoting *Camara v. Mun. Court of San Francisco*, 387 U.S. 523,528 (1967)). "[W]hat the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quoting *Elkins v. United States*, 364 U.S. 206, 222 (1960)).

The Fourth Amendment "contains no provision expressly precluding the use of evidence obtained in violation of its commands." *Herring v. United States*, 555 U.S. 135, 139 (2009) (quoting *Arizona v. Evans*, 514 U.S. 1, 10 (1995)). Over the course of many years, the Supreme Court developed the "exclusionary rule," which "forbids the use of improperly obtained evidence at trial." *Id.* The rule is "designed to safeguard Fourth Amendment rights generally through its deterrent effect" and is not a "necessary consequence of a Fourth Amendment violation." *Id.* at 139–40, 141 (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)); *Davis v. United States*, 564 U.S. 229, 236–37 (2011) (citations removed) ("Exclusion is not a personal constitutional right, nor is it designed to redress the injury occasioned by an unconstitutional search. The rule's sole purpose . . . is to deter future Fourth Amendment violations.").

The exclusionary rule serves to "prohibit[] introduction into evidence materials seized during an unlawful search, and of testimony concerning knowledge acquired

4

during an unlawful search." *United States v. Howard*, 621 F.3d 433, 451 (6th Cir. 2010) (quoting *Murray v. United States*, 487 U.S. 533, 536–37 (1988)). It also prohibits "the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes so attenuated as to dissipate the taint." *Id.*

In deciding whether evidence was obtained illegally, "the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." *United States v. Raddatz*, 447 U.S. 667, 679 (1980); Fed. R. Civ. P. 104(a) ("The court must decide any preliminary question about whether . . . evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege.").

### III. DISCUSSION

#### A. Standing

As an initial matter, Defendant does not have standing to object to a search of the car. "[B]ecause Fourth Amendment rights are personal, suppression of evidence as 'the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence.'" *United States v. Powell*, 847 F.3d 760, 768 (6th Cir. 2017) (quoting *United States v. Padilla*, 508 U.S. 77, 81-82 (1993)). This requires a defendant to demonstrate "that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *United States v. Noble*, 762 F.3d 509, 526 (6th Cir. 2014) (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)). In the Sixth Circuit, the law pertaining to a passenger's standing to contest the legality of a

vehicle search is well-settled: "Courts have routinely held that passengers who have no expectation of privacy or possessory interest in a stopped vehicle do not have standing to challenge the validity of a subsequent search of that vehicle on Fourth Amendment privacy grounds." *United States v. Bah*, 794 F.3d 617, 626 (6th Cir. 2015). Here, as a mere passenger, Defendant lacks standing because he had neither an expectation of privacy nor a possessory interest in the vehicle which carried the firearm. *See id.*; *United States v. Cantie*, 893 F. App'x 998, 1001 (6th Cir. 2021) ("[The defendant] has no standing to make this claim. As the passenger of the vehicle, [he] may challenge the lawfulness of an investigatory stop and subsequent detention, but he has no legitimate expectation of privacy in the vehicle and no standing to challenge a search of it."); *United States v. Mills*, No. 16-CR-20460, 2019 WL 3821917, at *4 (E.D. Mich. Aug. 15, 2019).

      Defendant argues that, although he was a passenger, he had a heightened expectation of privacy and therefore may contest the search. Specifically, he maintains that because he paid $10 to the driver (his cousin) for a ride, his expectation of privacy was equivalent to that of a houseguest or an "authorized 'business' guest of the driver." (ECF No. 28, PageID.91-92.) He relies on *Byrd v. United States*, 138 S. Ct. 1518, 1528-30 (2018) and *Rakas v. Illinois*, 439 U.S. 128, 150 (1978) in support of his argument.

      In *Byrd*, the Supreme Court found the defendant had a reasonable expectation of privacy as the sole occupant and driver of a rental vehicle, even though he was not named as an authorized driver in the rental agreement. *Id.* at 1531. The Court found that the defendant's situation was akin to that of a houseguest of an apartment because as the driver, he possessed "complete dominion and control over" the area searched

and "could exclude others from it." *Id.* at 1528 (citing *Rakas*, 439 U.S. at 149). And in *Rakas*, the Court explained that the defendant in *Jones v. United States*, 362 U.S. 257 (1960) had standing because he "not only had permission to use the apartment of his friend, but also had a key to the apartment . . . . Except with respect to his friend, Jones had complete dominion and control over the apartment and could exclude others from it." *Rakas*, 439 U.S. at 149. Defendant claims his case is analogous to *Byrd* and *Jones*, maintaining that similar to those defendants, "this was a business relationship between [Defendant] and the driver of the car. Thus, [Defendant] had a reasonable expectation of privacy in the vehicle."[1] (ECF No. 28, PageID.91.)

      Defendant's arguments miss the mark. The key, guiding principle to a finding of standing in both *Byrd* and *Jones* was that the defendant possessed "complete dominion and control" over the place of the search. *See Byrd*, 138 S. Ct. at 1528 (explaining the holdings of *Rakas* and *Jones*). Defendant lacked the type of "dominion and control" presented in these cases, especially since "a 'distinction . . . may be made in some circumstances between the Fourth Amendment rights of passengers and the rights of an individual who has exclusive control of an automobile or of its locked compartments.'" *Id.* (quoting *Rakas*, 439 U.S. at 154 (Powell, J., concurring)). As a merely passive passenger with no authority to control the vehicle or exclude others, Defendant's "possession" of the place searched was vastly different in nature than the

---

[1] Notably, to the extent Defendant argues this was a business relationship, courts have found there to be *less* expectation of privacy where an area is used for a business transaction, as "property used for commercial purposes is treated differently for Fourth Amendment purposes from residential property." *See United States v. Walsh*, 654 F. App'x 689, 704 (6th Cir. 2016) (quoting *Carter*, 525 U.S. at 90); *accord Savoy v. United States*, 604 F.3d 929, 936-37 (6th Cir. 2010)).

7

defendants' in *Byrd* and *Jones*—he therefore lacked a reasonable expectation of privacy that would entitle him to contest a search. The fact that he paid his cousin $10 for the ride does not alter this conclusion.[2] Defendant cites no case that confers Fourth Amendment standing to a vehicle's passenger simply by paying a friend or family member for a ride. In sum, Defendant's challenge to the search of the Lincoln necessarily fails for lack of standing.[3]

### B. Defendant's Seizure

While Defendant lacks standing to contest the *search* of the vehicle, he may nevertheless challenge whether he was lawfully seized. *See Bah*, 794 F.3d at 626 (citing *Brendlin v. California*, 551 U.S. 29, 251 (2007)) ("Passengers have standing to contest the lawfulness of their *seizure*."). In this regard, Defendant argues the "relevant issue is whether or not DPD . . . had reasonable suspicion that crime was afoot." (ECF No. 28, PageID.95.) Particularly, he maintains that the officers acted unlawfully when

---

[2] At the hearing, Defendant testified that the $10 was just to help with gas money.
[3] Even if Defendant had standing, the plain view doctrine would justify the search. Where "police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011) (quoting *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007)). A vehicle's occupant lacks a "legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." *Id.* (quoting *United States v. Campbell*, 549 F.3d 364, 373 (6th Cir. 2008)). Officer Brotzke testified at the hearing that the gun could be seen protruding out from under the seat onto the floorboard area as officers removed Defendant from the car; the incriminating character of the object was undoubtedly immediately apparent, especially given the circumstances leading to its discovery. *See, e.g., Galaviz*, 645 F.3d at 356 ("In Michigan, it is a crime to carry a pistol in a vehicle without a firearm license. . . . Therefore, the incriminating nature of a handgun in the vehicle was immediately apparent."); *Campbell*, 549 F.3d at 373 (applying the plain view doctrine to the discovery and seizure of a firearm where the butt of the gun was visible under the passenger seat to an officer standing outside the car).

they "order[ed] Defendant to exit the Lincoln" because there was insufficient evidence to support a finding of reasonable suspicion and thus "no basis for stopping or conducting a *Terry Stop*." (*Id.*)

"An investigatory stop of an individual by a law enforcement officer is proper so long as there is a reasonable basis for the stop." *United States v. Smith*, 584 F.3d 530, 536 (6th Cir. 2010) (citing *Terry*, 392 U.S. at 22-24). An officer may perform a limited investigatory seizure where the officer "has reasonable, articulable suspicion that [a] person *has been*, *is*, or is about to be engaged in criminal activity." *Id.* (quoting *United States v. Atchley*, 474 F.3d 840, 847 (6th Cir. 2007)). Law enforcement must point to more than an "inchoate and unparticularized suspicion or 'hunch,'" to justify a stop. *Terry*, 392 U.S. at 27. Rather, considering the totality of the circumstances, there must be "some minimal level of objective justification for making the stop . . . based upon specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience." *Smith*, 594 F.3d at 537 (internal quotations and citations omitted).

Defendant's challenge to his seizure fails primarily for two reasons. First, as to Defendant's argument that he was unlawfully ordered to exit (or remain inside) the Lincoln, the officers did not effectuate an illegal seizure.[4] The Supreme Court has made clear that "an officer making a traffic stop may order passengers to get out of the car

---

[4] The court notes that while Defendant claims he was ordered out of the vehicle, he was initially ordered only to put his hands up. In the footage of his arrest, some officers can be heard telling him to exit the car. (ECF No. 33, Ex. A at 1:53-1:58.) But as the situation intensified, Officer Brotzke directed Defendant to stop moving and to remain *inside* the vehicle. He specifically told Defendant as he tried to exit, "Don't move, I'll get you out." (ECF No. 33, Ex. A at. 1:59-2:04.)

9

pending completion of the stop" without violating the Fourth Amendment. *Maryland v. Wilson*, 519 U.S. 408, 415 (1997). The Sixth Circuit has adopted this rule, noting that in such situations the "interest in officer safety is 'legitimate and weighty,'" *Noble*, 762 F.3d at 521 (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977)), while there is only a "'minimal' intrusion on the passenger's liberty." *See United States v. Prigmore*, --- F.4th ----, 2021 WL 4735840, at *7 (6th Cir. 2021) (quoting *Maryland*, 519 U.S. at 413-15); *accord Bennett v. City of Eastpointe*, 410 F.3d 810, 822 (6th Cir. 2005) ("A concern for officer safety permits a variety of police responses in differing circumstances, including ordering a driver and passenger out of a car during a traffic stop."). The rule, which allows law enforcement stay in "command of the situation," applies equally where officers order a passenger "to remain *inside* the vehicle." *Prigmore*, 2021 WL 4735840, at *7 (quoting *Maryland*, 519 U.S. at 414). Only where an officer subsequently performs a "patdown" or frisk of either a driver or passengers must there be "reasonable suspicion that they may be armed and dangerous." *Noble*, 762 F.3d at 553 (quoting *Knowles v. Iowa*, 525 U.S. 113, 118 (1998)). Therefore, in the present case, the officers did not violate the Fourth Amendment when they ordered him out of the vehicle, nor did they violate his rights by ordering him to remain still inside the car once it appeared he was attempting to wield a gun. Their actions were necessary to control a dangerous situation, and they did not act improperly in doing so. *See Prigmore*, 2021 WL 4735840, at *7-8.

Second, to the extent that Defendant argues there was no reasonable suspicion for officers to draw their weapons, physically remove him from the vehicle and detain him, or seize the handgun, his arguments ignore the crucial information known to law

enforcement as they approached.[5] "The question here depends on whether the officers had reason to suspect that [Defendant] was armed and dangerous; if so, the officers were entitled—among other measures for their own safety—to remove him from the vehicle, handcuff him, frisk him for weapons, and conduct a protective search of the vehicle itself to ensure that [Defendant] could not retrieve a weapon upon reentering it." *United States v. Gatson*, 776 F.3d 405, 408–09 (6th Cir. 2015) (citing *Arizona v. Johnson*, 555 U.S. 323, 330-32 (2009)).

Law enforcement had reasonable suspicion to believe Defendant had engaged in criminal activity and that he was armed and dangerous when they initially approached him in the Lincoln; this reasonable suspicion only escalated when he repeatedly moved around when told to stop, reaching with his hands toward his lap, into the back seat area, and under his front seat. (*See* ECF No. 33, Ex. A at 0:35-2:30.) Leading up to DPD's investigation of Defendant, ATF informed DPD that Defendant was armed and present during a narcotics sale, had some involvement in firearm sales, and had bragged about previous incarcerations. (ECF No. 29, PageID.106-07.) ATF further advised that the armed individual was in the passenger seat of a Lincoln, and the car—which had an unregistered license plate not belonging to it—was traveling westbound

---

[5] While the DPD officers themselves did not have personal knowledge of Defendant's possession of a firearm, they lawfully relied on ATF's reports under the "collective knowledge" doctrine. *See United States v. Lyons*, 687 F.3d 754, 766 (6th Cir. 2012). "Because officers 'must often act swiftly [and] cannot be expected to cross-examine their fellow officers about the foundation of transmitted information,' we impute collective knowledge among multiple law enforcement agencies, even when the evidence demonstrates that the responding officer was wholly unaware of the specific facts that established reasonable suspicion for the stop." *Id.* (quoting *United States v. Barnes*, 910 F.2d 1342, 1344 (6th Cir. 1990)). The doctrine "applies equally to traffic stops and to vehicle searches." *Id.* at 766 n.4.

11

on Harper Avenue. (ECF No. 28, PageID.96; ECF No. 29, PageID.107.) DPD officers spotted the car on Harper Avenue, and it had the same license plate number as reported by ATF, which corroborated the information they received. (ECF No. 29, PageID.107.) Thus, even before the officers approached him, DPD's knowledge was substantially more than a mere "hunch" that Defendant was not only engaged in criminal activity but also that he could be armed and dangerous. *See Gatson*, 776 F.3d at 408 (finding reasonable suspicion of criminal activity where officers observed a suspect and vehicle that matched descriptions given by an informant, corroborating the informant's tip). Defendant then displayed verbal and physical noncompliance—to almost every "put your hands on top of your head" from an officer, Defendant responded "what's goin' on?"—and repeatedly reached around toward the back or the floor of the vehicle. (ECF No. 29, PageID.107-08; ECF No. 33, Ex. A at 0:35-2:30.) This behavior certainly amplified the reasonable suspicion that he possessed a firearm within his immediate control. Thus, the officers acted lawfully in removing him from the car, as they needed to detain him to stay in command of the situation during their investigation and ensure their safety. *See Prigmore*, 2021 WL 4735840, at *7-8 ("[O]nce police officers reasonably fear that suspects are armed and dangerous, they may order the suspects out of a car and may draw their weapons when those steps are reasonably necessary for the protection of the officers." (internal quotations omitted)).

Defendant's constitutional challenge to his seizure therefore falls short. As such, his objection to any derivative evidence stemming from the seizure fails as well. When DPD approached him, the officers had reasonable suspicion that Defendant was

engaged in criminal activity, armed, and dangerous. They acted lawfully in removing him from the vehicle, detaining him, and removing the firearm from underneath his seat.

### IV. CONCLUSION

For the reasons discussed above, Defendant does not have standing to contest the search of a vehicle in which he had no privacy or possessory interest, and any objection to his seizure ignores the significant facts of this case. Accordingly,

IT IS ORDERED that Defendant's "Motion to Suppress" (ECF No. 28) is DENIED.

                                            s/Robert H. Cleland                  /
                                            ROBERT H. CLELAND
                                            UNITED STATES DISTRICT JUDGE

Dated:  November 4, 2021

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, November 4, 2021, by electronic and/or ordinary mail.

                                            s/Lisa Wagner                    /
                                            Case Manager and Deputy Clerk
                                            (810) 292-6522

S:\Cleland\Cleland\JUDGE'S DESK\C2 ORDERS\21-20207.MICKENS.MotionToSuppress.MAZ.RHC.docx